# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

    v.                                                        Case Nos.    04-20115-JWL

**JACINTO E. HERNANDEZ a/k/a**
**Pelon a/k/a La Mona a/k/a Chinto a/k/a**
**Cinto a/k/a Peluchas, et al.,**[1]

    **Defendants.**

## MEMORANDUM AND ORDER

The Superseding Indictment in this case charges twenty-one defendants with thirty-eight counts of various crimes relating to an alleged conspiracy to distribute large quantities of cocaine and marijuana. The matter is before the court on two motions to suppress. First, defendant Jesus Saucedo-Ramirez has filed a motion to suppress (doc. #361) wiretap evidence; defendants Eduardo Agramon-Castro, Sandra Etters, Germain Devia, and Maria Hernandez join in this motion. Second, defendant Etters has filed a motion to suppress (doc. #363) evidence seized by law enforcement officers during a traffic stop; defendants Saucedo-Ramirez and Devia join in this motion. The court held a hearing on these motions on April 25, 2006. After

---

[1] The first-listed defendant in this case is Gerardo Reyes-Lopez. Mr. Reyes-Lopez entered his plea of guilty on January 20, 2006, and is no longer involved in the ongoing proceedings in this case. The clerk's office is therefore directed to re-style this case so that the second-listed defendant, Jacinto E. Hernandez, is now the first-listed defendant in the caption of this case.

thoroughly considering the parties' arguments and the evidence, the court is now prepared to rule. For the reasons explained below, the court will deny the defendants' motions to suppress in their entirety.

## MOTION TO SUPPRESS WIRETAP EVIDENCE

The defendants who move to suppress the wiretap evidence contend that the government's wiretap applications did not meet the statutory requirement of demonstrating that the orders were necessary to the investigation. Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. §§ 2510-2522, sets out a specific application procedure for federal investigators seeking permission to wiretap crime suspects. *United States v. Small*, 423 F.3d 1164, 1172 (10th Cir. 2005), *cert. denied*, 126 F.3d 1180, *and* 126 S. Ct. 1377 (2006), *and petition for cert. filed* (U.S. Apr. 7, 2006) (No. 05-10332). A judge may approve a wiretap application and authorize a wiretap order only if, among other things, "the wiretap is 'necessary' to investigate a serious offense enumerated on a statutory list." *United States v. VanMeter*, 278 F.3d 1156, 1159 (10th Cir. 2002). "This requirement is intended to ensure that the relatively intrusive device of wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Iiland*, 254 F.3d 1264, 1267 (10th Cir. 2001) (quotations omitted). "If an application was granted without meeting the necessity requirement, the wiretap evidence must be suppressed." *Id.* (same). The wiretap orders are presumed valid, and defendants bear the burden of proof to show otherwise. *United States v. Radcliff*, 331 F.3d 1153, 1160 (10th Cir.

2003); *United States v. Smart*, 278 F.3d 1168, 1172 (10th Cir. 2002); *Iiland*, 254 F.3d at 1268.

Title III requires the wiretap application to contain a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The authorizing judge must similarly find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id.* § 2518(3)(c); *accord Small*, 423 F.3d at 1172 (quoting the statute). Traditional investigative techniques include standard visual and aural surveillance, questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary), use of search warrants, infiltration by undercover agents or informants, pen registers, and trap and trace devices. *United States v. Cline*, 349 F.3d 1276, 1280 (10th Cir. 2003). If the government has not tried these traditional techniques, it must explain that failure with particularity. *Id.* Generalities, or statements in the conclusory language of the statute, are insufficient to support a wiretap application; the statements must be factual and they must specifically relate to the individuals being targeted by the wiretap. *Id*. at 1280-81. The court must consider all the facts and circumstances and read the necessity requirement in a common sense fashion, *id.* at 1281, rather than hypertechnically, *Smart*, 278 F.3d at 1172.

3

The court has carefully reviewed the initial wiretap application, affidavit, and order which were admitted into evidence[2] and the court finds that defendants have not rebutted the presumption that this wiretap order was valid.  The affidavit submitted in support of the application is sixty-one pages in length and describes in detail the investigation of an organization that federal agents believed to be smuggling large amounts of cocaine and marijuana from Chihuahua, Mexico, into the United States and transporting those illicit drugs throughout the United States.  The investigation began in 2002.  It included confidential informants and undercover meetings involving defendant Reyes-Lopez and his associates in Dallas; more than $1 million seized from two individuals driving a Porsche in Mississippi; the seizure of a shipment of a large quantity of marijuana in Edwardsville, Kansas; the interview of a drug debt collector and bodyguard for defendant Jacinto Hernandez; and the use of a confidential informant (CS-1) who was incarcerated.  The information collected during this investigation suggested that Mr. Hernandez was using his business, Anaco Transmissions (Anaco) in Merriam, Kansas, to store and distribute large amounts of cocaine and marijuana. Law enforcement officers used confidential sources (CS-2 and CS-3) to undertake controlled drug purchases and to interact with Mr. Hernandez and his associates concerning their drug

---

[2] Although the moving defendants ask the court to suppress all wiretap evidence in this case, their arguments and the evidence presented at the suppression hearing are directed only to the initial wiretap order. As noted previously, it is well established that all of the wiretap orders are presumed valid and that defendants bear the burden of proof to show otherwise. Because defendants have not raised any arguments or presented any evidence with respect to the subsequent wiretap orders (separate and apart from their challenge of the initial wiretap order), then, the court will confine its analysis accordingly.

business. Many of these incidents were tape recorded and many involved activities which centered around Anaco. Information revealed that Mr. Hernandez was careful using his phone and that he and his associates were careful about their activities because they were suspicious of the possibility that they were being watched and/or listened to by law enforcement officers. Another confidential informant (CS-4) provided information concerning Mr. Hernandez's drug activities, including that a Cuban individual was murdered for stealing drugs from Mr. Hernandez.

On February 9, 2004, the magistrate judge issued an order for a pen register, trap and trace, and subscriber information for Target Phone 1. The results revealed large numbers of telephone calls between Target Phone 1 and CS-3's phone, CS-4's phone, another phone number which CS-4 knew to be being used by an individual who was a major supplier of cocaine and marijuana for Messrs. Hernandez and Reyes-Lopez, and another phone number which was identified by other confidential sources as being that of a high-level cocaine and marijuana distributor in the Kansas City area. The results also revealed smaller numbers of calls between Target Phone 1 and phones known to be used by other individuals associated with drugs in Kansas City, New York, and New Mexico. Based on these results, the affidavit states that law enforcement officers believed Mr. Hernandez was using Target Phone 1 for drug distribution, money laundering activities, and attempts to evade law enforcement authorities. It opines that a wire intercept of Target Phone 1 would likely provide the means for securing the evidence necessary to prove that the named interceptees were engaged in the listed offenses. The affidavit further explains that although some members of this drug trafficking

organization had already been arrested, agents were attempting to gain additional evidence to successfully identify, arrest, and prosecute the principal members in order to dismantle the entire organization. The affidavit claims that wire interception of Target Phone 1 was needed to identify the organization's sources of supply; to identify the individuals who actually transported, stored, and distributed the cocaine and marijuana; to locate drug and currency storage locations; to identify bank accounts where drug monies were being laundered; and to identify all of the individuals who oversaw the organization and carried out the day-to-day activities for Mr. Hernandez and others.

The affidavit explains that other investigative techniques had been tried and failed, reasonably appeared to be unlikely to succeed if tried, or were too dangerous to employ. Physical surveillance had been conducted with limited success. For example, while agents were conducting surveillance at Anaco on February 7, 2004, Mr. Hernandez's nephew telephoned him and told him that a suspicious car was in the area and advised Mr. Hernandez not to come to Anaco. Agents also learned through CS-3 that Mr. Hernandez had installed video surveillance at Anaco that allowed him to observe activities outside Anaco. Agents considered the possibility of installing a pole camera to assist with physical surveillance, but installation was not feasible because it would have had to have been done overtly during business hours directly in front of Anaco. The affidavit explains that regular physical surveillance would likely have proven fruitless because counter-surveillance efforts and efforts to avoid detection would likely have compromised the investigation and, furthermore, information obtained by physical surveillance would only be of limited evidentiary value.

The affidavit further explains that the use of undercover personnel would have been unadvisable because, due to the close and secretive nature of organizations such as this one, it would have been highly unlikely and very dangerous for an undercover agent to have attempted to infiltrate the upper echelons of the organization. Also, it was unlikely that members of the organization would have allowed non-longtime associates to be privy to the complete scope of their criminal activities. Additionally, law enforcement officers had essentially exhausted their ability to obtain information from confidential informants. CS-1 was no longer in a position to provide additional information. The other cooperating individuals were only able to provide partial knowledge of the structure of the organization, not more complete information that could have led to the dismantling of the entire organization. For example, CS-3 could buy cocaine from Mr. Hernandez, but he did not know any additional information which could have led investigators to the source of supply. CS-4 was only able to provide the names and phone numbers of individuals working with Mr. Hernandez in the Kansas City area.

The affidavit explains that issuing grand jury subpoenas to the individuals who were believed to be involved in the conspiracy would probably not have been successful in achieving the stated goals of the investigation because the targets and co-conspirators would likely have been uncooperative, invoked their Fifth Amendment privilege in any event, and simply alerted the targets and their co-conspirators of the existence of the investigation, thereby compromising the investigation. The affidavit also explains that attempting to interrogate additional witnesses would probably have met with a similar fate. It probably would not have

7

led to truthful responses, thereby diverting the investigation with false leads. Additionally, it likely would have compromised the investigation by resulting in the possible concealment, movement, or destruction of documents, drugs, monies, and/or other evidence. The individuals who had already been arrested in connection with the organization were either no longer able to provide current information or were still in contact with members of the organization and would have alerted members of the organization to the investigation if they had been approached.

The affidavit explains that although pen registers could have been useful in identifying conspirators, at that time the investigation had not identified all telephones used by members of the organization. Additionally, the usefulness of such devices is limited in that they obviously do not reveal the content of the telephone calls. Also, many cellular telephones that were being used within the organization were in the names of individuals other than those who actually were using the telephones.

Lastly, the affidavit explains that search warrants would only have had a minimal impact on selected portions of the investigation. For example, a search warrant against one member of the organization would not necessarily have produced information which would have been useful as to all of the other members of the organization. In order successfully to dismantle the entire organization, agents preferred to delay all search warrants until they were prepared to arrest all of the key members of the organization. Likewise, although agents likely had probable cause at that point to obtain a search warrant for Anaco Transmission, they did not

have the means to seek additional search warrants for other locations known to be associated with Mr. Hernandez.

After reviewing the entire contents of the affidavit, the court is satisfied that it provides an adequate showing of necessity for the issuance of the wiretap order for Target Phone 1. The affidavit is not conclusory. It contains sufficient factual details explaining the extent to which traditional investigative techniques had already been used or not used and why use of those techniques would have been largely futile at that point. The affidavit indicates that this was a drug organization consisting of numerous individuals and large quantities of drugs. Law enforcement officers had already conducted visual surveillance, utilized confidential informants, questioned and interrogated individuals when the opportunity arose, and had utilized a pen register/trap and trace device prior to issuance of the wiretap order. More overt surveillance and/or the use of grand jury subpoenas could not have been conducted because of the risk of compromising the investigation. Similarly, a search warrant would have blown the cover of the investigation without providing much fruitful evidence with respect to the operation as a whole. Utilizing an undercover agent was not feasible given the nature of the organization. Given the factual background of the investigation, the court is satisfied that normal investigative procedures were tried and failed or reasonably appeared to have been unlikely to succeed if tried. Thus, issuance of the wiretap order was warranted in order to effectively penetrate this drug trafficking organization. *See, e.g.*, *United States v. Iiland*, 254 F.3d at 1268 (upholding district court's rejection of the defendant's necessity challenge where specific evidence presented by the government showed that the wiretaps were necessary to

develop the full scope and breadth of the drug conspiracy). Accordingly, defendant Saucedo-Ramirez's motion to suppress is denied.

## MOTION TO SUPPRESS
## EVIDENCE SEIZED DURING TRAFFIC STOP

Defendant Etters asks the court to suppress from evidence at trial the fact that law enforcement officers found approximately nine ounces of cocaine in a plastic bag in a candy box underneath the driver's seat of her automobile during a traffic stop. The government contends that law enforcement officers' stop and search of her car was justified on the grounds that Drug Enforcement Administration (DEA) agents had probable cause to believe that Ms. Etters had drugs in her vehicle. The court held a hearing on the motion on April 25, 2006, and gave the parties an opportunity to present evidence on this motion. They declined to do so; Ms. Etters opted instead to stipulate that the facts were as stated in the government's response in opposition to the motion to suppress. Consequently, no factual dispute exists here. Rather, the sole issue presented is whether law enforcement officers violated Ms. Etters' rights under the Fourth Amendment by stopping and searching her vehicle based on the facts as stated in the government's response brief.

**A.   Facts**

Following are the facts which were known to federal agents at the time of the traffic stop. From approximately January of 2002 through August of 2004, defendants Gerardo Reyes-Lopez, Jacinto Hernandez, Bill Joe Antle, and Sigifredo Paez organized shipments of

marijuana and cocaine to be delivered from Mexico through Texas and into the greater Kansas City metropolitan area and other states. The organization used various means to transport cocaine and marijuana such as commercial trucks, passenger vehicles, and trailers. DEA agents obtained court orders to wiretap cellular telephones, including those used by Jacinto Hernandez (Target Phone 1) and Bill Antle (Target Phone 4). Evidence obtained through those wiretaps revealed that Messrs. Hernandez and Antle were using Anaco as a front to distribute marijuana and cocaine. The two would travel to El Paso, Texas, and bring back illegal narcotics and then partially distribute the drugs from Anaco.

On June 11, 2004, Mr. Antle and Dennis Goyer, another co-defendant, discussed Goyer's need for a "Cadillac," meaning the need for one kilogram of cocaine. During that conversation, Mr. Antle stated that he had brought back "twins" from El Paso, meaning that he had brought back two kilograms of cocaine. On June 15, 2004, Mr. Antle told Mr. Hernandez that he had money because Mr. Goyer had taken "twenty," meaning that Mr. Goyer had recently purchased twenty pounds of marijuana. On June 15, 2004, Mr. Antle and defendant Germain Devia discussed Mr. Devia delivering cocaine to Mr. Antle. The two then met at Anaco.

When Mr. Antle checked his voicemail messages on June 15, 2004, the second message he retrieved was from telephone number 660-886-8877. Ms. Etters was listed as the subscriber for this telephone number and a pen register showed her address to be 2202 Arcadia Street, Clinton, Missouri. The caller identified herself as "Sandy" and asked Mr. Antle to call her. Mr. Antle called Ms. Etters back. Ms. Etters asked him what had been going on and he responded that he had been "running up and down the road." Ms. Etters asked if there was

"anything going on up there," and Mr. Antle responded that the "guy" was still on vacation. Ms. Etters asked Mr. Antle if there was the possibility of anything soon. He stated that he would try to "retune [his] television." Ms. Etters said that things were getting desperate and that she needed a little help. Mr. Antle asked her how big of a "car" she needed. Ms. Etters responded that the "car" could be as big as the last time, but not any bigger. She continued to ask Mr. Antle for assistance and asked if he had any other friends. He responded that he did not have any other friends but that he believed the other guy would have returned from vacation by now. DEA agents believed, based on their training and experience, that the reference to a "car" was code for a quantity of illegal narcotics.

At approximately 9:06 a.m. the next day, June 16, 2004, DEA agents intercepted another phone call between Mr. Antle and Ms. Etters. Mr. Antle told Ms. Etters that he had found her a $6,000 "car." She asked if he would accept a credit card check and stated that she had paid with a check on the previous occasion. He responded that the government tracks those types of transactions and gets you with taxes at the end of the year, but he nevertheless agreed to accept the check. Ms. Etters told Mr. Antle that she would call him when she got off work. At approximately 12:37 p.m., she called Mr. Antle and told him that she was preparing to leave town and that she would see him in about an hour and a half to an hour and fifteen minutes. At approximately 2:07 p.m., she called Mr. Antle and told him that she would see him shortly. At approximately 2:08 p.m., DEA agents observed a white Ford Explorer arrive and park in the spaces along the north side of Anaco. A Hispanic male exited the vehicle and entered the business. At 2:10 p.m., agents observed a silver Toyota 4-Runner arrive and park directly in


front of Anaco.  The 4-Runner had a Missouri license plate which was registered to Ms. Etters at 2202 South Arcadia, Clinton, Missouri.  Ms. Etters got out of the vehicle and approached the office.

At 2:14 p.m., a Hispanic male entered Ms. Etters' vehicle and moved it to the front of an open bay door.  At 2:17 p.m., agents observed Ms. Etters meet with Mr. Antle near the office area of the business.  At 2:19 p.m., agents watched a Hispanic male enter and exit the white Ford Explorer and then return to the business.

At 2:35 p.m., Ms. Etters left Anaco in her 4-Runner.  Agents followed her out of town. She stopped briefly at a Sonic restaurant before proceeding eastbound on a Missouri highway toward Clinton, Missouri.  DEA agents contacted the Missouri Highway Patrol (MHP) to request that they conduct a traffic stop of Ms. Etters' vehicle.  MHP Trooper Christ West pulled over Ms. Etters for speeding near Urich, Missouri, although it is undisputed that Ms. Etters was not speeding and she did not commit any other traffic violation which would have justified the stop.  MHP Sergeant Gray asked Ms. Etters for permission to search her vehicle for drugs, but she refused.  He then consulted with agents who informed him that there was probable cause to search her vehicle for drugs.  MHP troopers searched her vehicle and recovered 266 grams (9.4 ounces) of cocaine from a plastic bag contained in a candy box under the driver's seat.  At the request of DEA agents, Ms. Etters was not arrested at that time.

**B.    Discussion**

The Fourth Amendment prohibits unreasonable searches and seizures by the government.  U.S. Const. amend. IV.  "The detention of a driver, however brief, during the

13

course of a routine traffic stop constitutes a seizure within the meaning of the Fourth Amendment." *United States v. Edgerton*, 438 F.3d 1043, 1047 (10th Cir. 2006). Either probable cause or reasonable suspicion is sufficient to justify a traffic stop, but only the lesser requirement of reasonable suspicion is necessary. *Id.*  Consequently, the reasonableness of a traffic stop is typically analyzed under the investigative detention principles of *Terry v. Ohio*, 392 U.S. 1 (1968)). *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005); *United States v. Holt*, 264 F.3d 1215, 1228 (10th Cir. 2001) (en banc). The *Terry* standard for reasonable suspicion is whether an officer reasonably believes that "criminal activity may be afoot." *Terry*, 392 U.S. at 30. Under *Terry*, the court makes "a dual inquiry, asking first 'whether the officer's action was justified at its inception,' and second 'whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" *Bradford*, 423 F.3d at 1156 (quoting *Terry*, 492 U.S. at 20). The higher probable cause standard is satisfied "when the evidence would warrant a person of reasonable caution to believe that evidence of a crime will be found at the place to be searched." *United States v. Jurado-Vallejo*, 380 F.3d 1239, 1241-41 (10th Cir. 2004) (quotation and brackets omitted). The court examines the events "leading up to the stop to determine whether historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or probable cause." *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004) (quotation omitted).

Turning to the validity of the initial stop, the totality of the circumstances give rise to an objectively reasonable belief that criminal activity was afoot and that a person of reasonable

caution would have believed that drugs would be found in Ms. Etters' vehicle. Probable cause and/or reasonable suspicion can rest on the collective knowledge of law enforcement, rather than solely on that of the arresting officer. *United States v. Miramonted*, 365 F.3d 901, 905 (10th Cir. 2004); *United States v. Swingler*, 758 F.2d 477, 487-89 (10th Cir. 1985) (finding probable cause for automobile searches and the arrest of their occupants based on knowledge possessed by FBI agents, not the arresting state officers, that the defendants were transporting amphetamines); *United States v. Merritt*, 695 F.2d 1263, 1268 (10th Cir. 1982) ("In assessing whether the police . . . had sufficient justification to make an investigatory stop we must, of course, look to the knowledge of all the police involved in this criminal investigation . . . ."). In this case, the DEA knew that Messrs. Hernandez and Antle were engaged in a drug business in which they would travel to El Paso, Texas, and bring back marijuana and cocaine to the Kansas City area and distribute it using Anaco as a front; they knew via wire interceptions of telephone conversations in the days and hours immediately preceding the stop that the organization had recently brought back two kilograms of cocaine from El Paso; they knew that Ms. Etters had a telephone conversation with Mr. Antle on June 15, 2004, regarding her need to purchase a "car" that was not any bigger than the last time; they knew that on June 16, 2004, Mr. Antle had telephoned Ms. Etters and told her that he had a $6,000 "car" for her and that she made numerous phone calls to him later that day to alert him that she was on her way; they believed that "car" referred to illegal narcotics; and they observed her arrive at Anaco, a place which they knew to be a drug business. The court defers to the DEA agents' belief that Mr. Antle and Ms. Etters were talking about an anticipated drug sale rather than a car sale primarily

15

because of trained law enforcement officers' ability to distinguish between innocent and suspicious circumstances, *United States v. Santos*, 403 F.3d 1120, 1124 (10th Cir. 2005), and also because of the implausibility of the notion that the two were actually discussing the purchase of a car during the telephone conversations. Their discussion of the "car" consisted only of its size (no bigger than last time) and its price ($6,000), a fairly odd conversation that certainly would not be representative of a normal conversation concerning a purchase of a vehicle which would be expected to involve a much more thorough discussion of the car's characteristics. Moreover, Ms. Etters pulled up to Anaco in a perfectly good Toyota 4-Runner. Then, while at Anaco, officers observed a Hispanic male enter and move her vehicle and they observed her meeting with Mr. Antle near the office area of the business. This consisted of all of the activity necessary to complete the then-anticipated exchange of drugs (the Hispanic male depositing the drugs in Ms. Etters' vehicle) for money (Ms. Etters giving the money to Mr. Antle). Based on the totality of these circumstances, the court finds that law enforcement officers had both reasonable suspicion and probable cause to believe that Ms. Etters was transporting drugs in her vehicle when she left Anaco. The fact that the stop of Ms. Etters was not justified by a traffic violation is of no consequence. *United States v. Green*, 178 F.3d 1099, 1107 (10th Cir. 1999) (noting the officers did not need to wait for the defendant to commit a traffic violation to stop his vehicle where they had probable cause to stop and arrest him).

This is not a case in which law enforcement officers knew nothing more than that Ms. Etters had just left a known drug business. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)

("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."); *United States v. Swindle*, 407 F.3d 562 (2d Cir. 2005) (the mere fact that a suspect had left a drug house was alone insufficient to justify a *Terry* stop). But, "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Wardlow*, 528 U.S. at 124. Thus, the fact that Ms. Etters had just left Anaco certainly is an important factor in the court's analysis. In this case, there is additional evidence in the form of officers observing what appeared to have been the placement of the drugs in her vehicle by the Hispanic male while she paid Mr. Antle for the drugs, which is little different than a situation where a person has met with a known drug dealer and departed carrying a bag. *See, e.g.*, *United States v. Powell*, 222 F.3d 913, 917-18 (11th Cir. 2000) (traffic stop was justified where the defendant had left the house of a known drug trafficker and had been observed going in and out of the residence with a backpack); *United States v. Glinton*, 154 F.3d 1245, 1259 (11th Cir. 1998) (same, where surveillance agents had observed the defendant meeting with a known cocaine dealer and depart carrying a red gym bag). As if that were not enough, all of this coincided with the events as planned by the series of drug-sale-related telephone calls that DEA agents intercepted in the days and hours leading up to her visit to Anaco which indicated that she was coming there to purchase drugs from Mr. Antle. *See, e.g.*, *United States v.*

17

*Ramirez*, 60 Fed. Appx. 130, 132 (9th Cir. 2003)[3] (finding officers had probable cause to stop vehicle where they believed the defendant was involved in the delivery of cocaine because they had intercepted a series of evidently drug-sale-related phone calls, witnessed the defendant's arrival and departure and noted that these events coincided with the placement of relevant phone calls, and observed the defendant depart in the direction indicated by his boss); *see also, e.g.*, *United States v. Wright*, 171 F. Supp. 2d 1195, 1202 (D. Kan. 2001) (traffic stop was justified where officers had reason to believe defendants were transporting drugs based on intercepted telephone calls and surveillance leading up to the traffic stop); *cf. United States v. Ridge*, 329 F.3d 535, 540-51 (6th Cir. 2003) (officers were justified in stopping defendant's vehicle where they had intercepted a phone call that "Danny's on the way with the money," they had been informed that Danny cooked methamphetamine, and they observed a van arriving approximately twenty minutes later). In sum, the totality of the circumstances in this case created both reasonable suspicion and probable cause to believe that Ms. Etters was transporting drugs in her vehicle when she left Anaco.

Turning to the length and manner of the detention, Ms. Etters makes no suggestion that the MHP troopers were dilatory in their investigation by detaining her for an unreasonable length of time. It is well established that authorities are entitled to briefly detain and investigate a vehicle that is reasonably suspected of smuggling contraband. *See United States v. Sharpe*, 470 U.S. 675, 687-88 (1985) (holding the stop of a vehicle and a subsequent

---

[3] The court is citing this unpublished case for its highly persuasive value on a material issue.

18

twenty-minute investigatory detention was reasonable where authorities observed circumstances indicative of drug trafficking). Therefore, the MHP troopers' actions in briefly detaining Ms. Etters while they asked for permission to search her vehicle for drugs was reasonably related in scope to the circumstances which justified the traffic stop.

When she refused to give her consent to the search, this did not negate the fact that officers already had probable cause to believe that she was carrying drugs in her vehicle. *United States v. Williams*, 403 F.3d 1203, 1207 (10th Cir. 2005) (noting that refusal to consent does not negate observations made prior to the refusal). And, "[u]nder the automobile exception to the Fourth Amendment's warrant requirement, police officers who have probable cause to believe there is contraband inside an automobile that has been stopped on the road may search it without obtaining a warrant." *Bradford*, 423 F.3d at 1159 (quotation omitted). "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." *Id.* (quotation omitted); *accord Jurado-Vallejo*, 380 F.3d at 1238. "Once probable cause to search is established, the officer may search the entire vehicle, including the trunk and all containers therein that might contain contraband." *Bradford*, 423 F.3d at 1159 (citing *United States v. Ross*, 456 U.S. 798, 825 (1982)). More specifically, the police may "search any package within the vehicle that is capable of concealing the object of the search." *United States v. Edwards*, 242 F.3d 928, 939 (10th Cir. 2001).

As discussed previously, law enforcement officers had probable cause to believe that Ms. Etters was carrying drugs in her vehicle. Consequently, under the exceptions to the

warrant requirement for automobiles and containers therein, the MHP troopers were entitled to conduct the search of her vehicle during which they discovered the cocaine located in the candy box under the driver's seat. This container was undoubtedly capable of concealing drugs. Accordingly, Ms. Etters' Fourth Amendment rights were not violated by the initial stop, the brief detention to request consent to search, or the subsequent search of her vehicle without a warrant. All of these actions were justified by probable cause to believe that she was transporting drugs.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant Jesus Saucedo-Ramirez's Motion to Suppress (doc. 361) is denied.

**IT IS FURTHER ORDERED** that defendant Sandra Etters' Motion to Suppress Evidence (doc. 363) is denied.

**IT IS SO ORDERED** this 5th day of May, 2006.

                s/ John W. Lungstrum
                John W. Lungstrum
                United States District Judge